**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**Lufkin Division**

| | |
|---|---|
| **MATTHEW DUCKWORTH**, on behalf of himself and all others similarly situated,<br>*Plaintiff*,<br><br>v.<br><br>**NACOGDOCHES COUNTY HOSPITAL DISTRICT d/b/a NACOGDOCHES MEMORIAL HOSPITAL**,<br>*Defendant*. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR A JURY TRIAL |

**CLASS ACTION COMPLAINT**

Plaintiff Matthew Duckworth, on behalf of himself and all others similarly situated, alleges the following against Defendant Nacogdoches County Hospital District d/b/a Nacogdoches Memorial Hospital ("Defendant" or "NMH") upon personal knowledge as to his own acts, and based upon his investigation, his counsel's investigation, and information and belief as to all other matters.

**INTRODUCTION**

1. This class action arises out of the recent data security incident and data breach that was perpetrated against Defendant (the "Data Breach"), which held in its possession certain personally identifiable information ("PII") and protected health information ("PHI") (collectively,

the "Private Information") of individuals whose information was provided to Defendant in connection with Defendant's healthcare services.

2. Defendant is a 226-bed hospital in Nacogdoches, Texas.[1]

3. In the course of providing healthcare services, Defendant received PII and PHI from numerous individuals, including Plaintiff. In turn, Defendant came into the possession of, and maintains extensive files containing PII and PHI of these individuals, and owes these individuals an affirmative duty to adequately protect and safeguard this private information against theft and misuse. Despite such duties created by statute, regulation, and common law, at all relevant times, Defendant utilized deficient data security practices, thereby allowing sensitive and private data to fall into the hands of strangers.

4. On or around January 31, 2026, Defendant "became aware of a data security incident as a result of a cyber-attack in which an unauthorized party compromised Nacogdoches Memorial Hospital's computer network and information systems."[2]

5. Defendant's investigation revealed that the unauthorized actor first gained access to Defendant's network on January 15, 2026.[3]

6. Defendant did not begin notifying affected individuals until on or around March 27, 2026.[4]

---

[1] Steve Alder, *Nacogdoches Memorial Hospital Data Breach More Than 257,000 Individuals*, THE HIPAA J. (APR. 1, 2026), https://www.hipaajournal.com/nacogdoches-memorial-hospital-data-breach/ (last visited Apr. 9, 2026).

[2] *See* Exhibit A.

[3] Alder, *supra* note 1.

[4] *See* Exhibit A.

7. But for Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect these individuals' PII and PHI, the Data Breach would not have occurred.

8. Defendant is well-aware that it is at high risk of attempted cyberattack due to the high value of the sensitive data.

9. Despite Defendant's awareness of both the value and sensitivity of the data it safeguarded and serious risk presented by insufficient security practices, Defendant did not take sufficient steps to ensure that its systems were secure. Defendant knew or should have known about the risk to the data it stored and processed, and the critical importance of adequate security measures in the face of increasing threats.

10. The Data Breach was directly and proximately caused by Defendant's failure to implement reasonable and industry-standard data security practices necessary to protect its systems from a foreseeable and preventable cyberattack. Through this wrongful conduct, the sensitive PII and PHI of over 250,000 individuals is now in the hands of cybercriminals, who target this sensitive data for its value to identity thieves. Plaintiff and Class Members are now at a significantly increased and impending risk of fraud, identity theft, and similar forms of criminal mischief—risks which may last the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes. Moreover, Plaintiff and Class Members have lost the inherent value of their private data.

11. By aggregating information obtained from the Data Breach with other sources or other methods, criminals can assemble a full dossier of private information on an individual to facilitate a wide variety of frauds, thefts, and scams. Criminals can and do use victims' names and

other personal information to open new financial accounts, incur credit charges, obtain government benefits and identifications, fabricate identities, and file fraudulent tax returns well before the person whose PII was stolen becomes aware of it. Any one of these instances of identity theft can have devastating consequences for the victim, causing years of often irreversible damage to their credit scores, financial stability, and personal security. Likewise, the exfiltration of protected health information puts Plaintiff and the Class Members at a present and continuing risk of medical identity theft, which poses an even more critical threat to victims because such fraud could lead to loss of access to necessary healthcare through misuse of paid-for insurance benefits or by incurring substantial medical debt.

12. Moreover, Defendant's failure to notify Plaintiff and Class Members that they had been impacted by the Data Breach for nearly two months after Defendant became aware of the breach harmed Plaintiff and made it more difficult for Plaintiff to take swift action to respond to the breach.

13. Plaintiff and Class Members have been harmed because they are at immediate risk of having their personal information used against them. Indeed, they have been at risk well before Defendant even notified Plaintiff of the breach. Plaintiff does not know if his data has been sold, transferred, replicated, or irrevocably disseminated and exposed. Plaintiff has suffered harm in the loss of the value of his data which cannot be easily recovered, if ever.

14. Plaintiff, individually and on behalf of a nationwide class, alleges claims of (1) Negligence, (2) Negligence *Per Se*, (3) Breach of Implied Contract, (4) Unjust Enrichment, and (5) violation of the Texas Deceptive Trade Practices Act. Plaintiff also seeks declaratory and injunctive relief. Plaintiff asks the Court to compel Defendant to adopt reasonable information

security practices to secure the sensitive PII and PHI that Defendant collects and stores in its databases and to grant such other relief as the Court deems just and proper.

## PARTIES

***Plaintiff***

15. Plaintiff Matthew Duckworth is a citizen and resident of Nacogdoches, Texas.

***Defendant***

16. Defendant Nacogdoches County Hospital District d/b/a Nacogdoches Memorial Hospital is a Texas governmental unit and hospital district with its principal executive office located at 1204 North Mound Street, Nacogdoches, Texas.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

18. This Court has personal jurisdiction over Defendant through its business operations in this District, the specific nature of which occurs in this District. Defendant's principal place of business is in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Defendant is also

based in this District, maintains Plaintiff's and Class Members' Private Information in this District, and has caused harm to Plaintiff and Class Members from and/or in this District.

## FACTUAL ALLEGATIONS

### I. Background

20. Defendant is a 226-bed hospital that was founded in 1928 as City Memorial Hospital.[5]

21. On June 12, 1967, "the Texas Legislature passed House Bill #1248, establishing the Nacogdoches County Hospital District."[6] Nacogdoches County Hospital District took ownership of the hospital on May 6, 1968, and renamed it Memorial Hospital.[7]

22. Defendant provides emergency and trauma care, surgery, geriatric psychiatry care, rehab and therapy, imaging, cardiology, pediatrics, women's health, pain management, nutrition and wound care.[8]

23. As a condition of providing these services, Defendant requires that its patients entrust it with highly sensitive personal information. In the ordinary course of receiving services from Defendant, Plaintiff and Class Members were required to provide their Private Information to Defendant.

---

[5] Alder, *supra* note 1; *Our Hospital*, NACOGDOCHES MEMORIAL HOSPITAL, https://nacmem.org/our-hospital/ (last visited Apr. 9, 2026).

[6] *Our Hospital*, NACOGDOCHES MEMORIAL HOSPITAL, https://nacmem.org/our-hospital/ (last visited Apr. 9, 2026).

[7] *Id.*

[8] *Services*, NACOGDOCHES MEMORIAL HOSPITAL, https://nacmem.org/services/ (last visited Apr. 9, 2026).

24. Defendant does not have an online privacy policy, but its website states that "HIPAA compliance is strictly followed to protect your privacy."[9]

25. Defendant also offers an online portal called "My Memorial" which allows patients to review their test results, request prescription refills, communicate securely with providers, pay their bills online, and update contact or insurance information.[10]

**II. The Breach**

26. On or around January 31, 2026, Defendant "became aware of a data security incident as a result of a cyber-attack in which an unauthorized party compromised Nacogdoches Memorial Hospital's computer network and information systems."[11]

27. Defendant's investigation revealed that the unauthorized actor first gained access to Defendant's network on January 15, 2026.[12]

28. Defendant did not notify affected individuals until on or around March 27, 2026.[13]

29. According to Defendant's Data Breach Notice, the unauthorized actor accessed the following information: names, addresses, phone numbers, email addresses, Social Security numbers, dates of birth, medical record numbers, account numbers, health plan beneficiary numbers, and, for certain individuals, full face photograph images.[14]

---

[9] *Patients and Visitors*, NACOGDOCHES MEMORIAL HOSPITAL, https://nacmem.org/patients-visitors/ (last visited Apr. 9, 2026).

[10] *Id.*

[11] *See* Exhibit A.

[12] Alder, *supra* note 1.

[13] *See* Exhibit A; *Data Breach Notifications*, OFF. MAINE ATTY GEN. (MAR. 31, 2026), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/ebcabbec-590c-4fd3-b97c-555fd8ced542.html (last visited Apr. 9, 2026).

[14] *See* Exhibit A.

30. The Data Breach Notices do not provide details about the root cause of the Data Breach, the vulnerabilities exploited, the criminals responsible for the breach, and the remedial measures undertaken to ensure such a breach does not occur again. To date, Defendant has not explained or disclosed these facts to Plaintiff and Class Members.

31. Without these details, Plaintiff's and Class Members' ability to mitigate harms resulting from the Data Breach is severely diminished.

32. Defendant's Data Breach notice offers no substantive steps to help victims like Plaintiff and Class Members to protect themselves, which is woefully inadequate considering the lifelong increased risk of fraud and identity theft that Plaintiff and Class Members now face as a result of the Data Breach.

33. Defendant has not offered affected individuals identity theft protection or credit monitoring services. It solely "encourage[s]" individuals "to always remain vigilant, monitor your accounts, and immediately report any suspicious activity or suspected misuse of your personal information."[15] These limitations are inadequate when the victims will likely face many years of identity theft.

34. Moreover, Defendant's advice to Plaintiff and Class Members squarely places the burden on Plaintiff and Class Members, rather than on Defendant, to monitor and report suspicious activities to law enforcement. In other words, Defendant expects Plaintiff and Class Members to protect themselves from its tortious acts resulting from the Data Breach. Rather than automatically enrolling Plaintiff and Class Members in credit monitoring or identity protection services (or even *offering* these services) upon discovery of the Data Breach, Defendant merely sent instructions to Plaintiff and Class Members about actions they could affirmatively take to protect themselves.

[15] *Id.*

## III. The Healthcare Sector Is Increasingly Susceptible to Data Breaches, Giving Defendant Ample Notice That It Was a Likely Cyberattack Target

35. At all relevant times, Defendant knew, or should have known, that the PII and PHI it was entrusted with was a target for malicious actors. Defendant knew this given the unique type and the significant volume of data on its networks, servers, and systems, comprising individuals' detailed and confidential personal information and, thus, the significant number of individuals who the exposure of the unencrypted data would harm.

36. As custodian of Plaintiff's and Class Members' PII and PHI, Defendant knew or should have known the importance of protecting their PII and PHI, and of the foreseeable consequences and harms to such persons if any data breach occurred.

37. Defendant was on notice that the FBI has been long concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[16]

38. In January 2023, HHS created a presentation specifically for healthcare providers and IT departments, warning entities like Defendant of the severe threats posed by cybercriminal groups.[17]

---

[16] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers- idUSKBN0GK24U20140820.

[17] *See* Royal & BlackCat Ransomware: The Threat to the Health Sector, *available at* https://www.hhs.gov/sites/default/files/royal-blackcat-ransomware-tlpclear.pdf (last visited June 24, 2025).

39. Defendant's security obligations were especially important due to the substantial increase of cyberattacks and data breaches in recent years, particularly those targeting healthcare businesses and other organizations like Defendant, which store and maintain large volumes of PII and PHI. These largescale cyberattacks are increasingly common and well-publicized. Through the end of November 2023, 640 largescale cyberattacks had targeted hospitals, health systems, and healthcare records in 2023, affecting more than 115 million people—making 2023 the "worst-ever year for breached healthcare records."[18]

40. Ransomware groups often post links to stolen data on a Data Leak Site ("DLS").[19] A DLS is a "website where the illicitly retrieved data of companies, that refuse to pay the ransom, are published."[20]

41. However, even if a ransomware group removes stolen data from its DLS when a ransom is paid, there is no guarantee that the data will be deleted.[21] The stolen Private Information is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[22]

---

[18] Steve Alder, *November 2023 Healthcare Data Breach Report*, THE HIPAA J. (Dec. 21, 2023), https://www.hipaajournal.com/november-2023-healthcare-data-breach-report/.

[19] Steve Alder, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA J. (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/#:~:text=While%20ransomware%20groups%20usually%20remove,little%20incentive%20to%20delete%20it. (last visited July 23, 2025).

[20] *Dedicated Leak Sites (DLS): Here's what you should know*, GROUP-IB, https://www.group-ib.com/resources/knowledge-hub/dedicated-leak-sites/ (last visited April 3, 2025).

[21] Alder, *supra* note 19.

[22] *Id.*

42. Ransomware groups can therefore monetize stolen Private Information and sell it on the dark web as part of a full identity profile.[23] Buyers can then use that information to conduct different types of identity theft or fraud, such as to file a fake tax return, to apply for a fraudulent mortgage or to open a bank account while impersonating the victim.[24]

43. Patient records, such as those stolen from Defendant, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail."[25] The record sets are then sold on Dark Web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[26]

44. With the surging number of such attacks targeting companies in the healthcare sector, Defendant knew or should have known that it was at high risk of cyberattack and should have taken additional and stronger precautions and preemptive measures.

45. The information compromised in the Data Breach—including detailed medical information—is much more valuable than the loss of credit card information in a retailer data breach. There, victims can simply close their credit and debit card accounts and potentially even rely on automatic fraud protection offered by their banks. Here, however, the information compromised is much more difficult, if not impossible, for consumers to re-secure after being

---

[23] Anthony M. Freed, *Which Data Do Ransomware Attackers Target for Double Extortion?*, MALICIOUSLIFE BY CYBEREASON, https://www.cybereason.com/blog/which-data-do-ransomware-attackers-target-for-double-extortion (last visited July 3, 2025).

[24] *Id.*

[25] Steve Alder, *Editorial: Why Do Criminals Target Medical Records*, THE HIPAA J. (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last visited Aug. 22, 2025).

[26] *Id.*

stolen because it goes to the core of their identity. An individual's medical history and assessments are permanent and are impossible to escape. The loss of all this medical data puts Plaintiff and Class Members at additional risk for potential medical fraud and medical identity theft.

46. Data breaches and disclosures involving medical records are not only incredibly costly, they can "also [be] more difficult to detect, taking almost twice as long as normal identity theft."[27] The FTC warns that a thief may use private medical information to, among other things, "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care"[28] and that this may have far reaching consequences for a victim's ability to access medical care and use insurance benefits.

**IV. Defendant Failed to Comply with FTC Guidelines**

47. At all times relevant to this Complaint, Defendant knew or should have known the significance and necessity of safeguarding PII and PHI, and the foreseeable consequences of a data breach. Defendant knew or should have known that because it collected and maintained the PII and PHI for a significant number of patients, a significant number of patients would be harmed by a breach of its systems. Defendant further knew due to the nature of its business practices that the data it was entrusted with was highly valuable and contained private and sensitive information including medical information.

48. Because PII is so sensitive and cyberattacks have become a rising threat, the FTC has issued numerous guides for businesses holding sensitive PII and emphasized the importance

[27] *What to Know About Medical Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Nov. 22, 2023).

[28] *Id.*

of adequate data security practices. The FTC also stresses that appropriately safeguarding PII held by businesses should be factored into all business-related decision making.

49. An FTC Publication titled "Protecting Personal Information: A Guide for Business" lays out fundamental data security principles and standard practices that businesses should implement to protect PII.[29] The guidelines highlight that businesses should (a) protect the personal customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.

50. The FTC also recommends businesses use an intrusion detection system, monitor all incoming traffic to the networks for unusual activity, monitor for large amounts of data being transmitted from their systems, and have a response plan prepared in the event of a breach.

51. The FTC also recommends that businesses limit access to sensitive PII, require complex passwords to be used on the networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

52. Businesses that do not comply with the basic protection of sensitive PII are facing enforcement actions brought by the FTC. Failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data is an unfair act or practice prohibited pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

[29] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business. (last accessed March 21, 2024).

53. Many states' unfair and deceptive trade practices statutes are similar to the FTC Act, and many states adopt the FTC's interpretations of what constitutes an unfair or deceptive trade practice.

54. Defendant knew or should have known of its obligation to implement appropriate measures to protect PII in its possession but failed to comply with the FTC's basic guidelines.

55. Defendant's failure to employ reasonable measures to adequately safeguard against unauthorized access to PII constitutes an unfair act or practice as prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, as well as by state statutory analogs.

56. Once Defendant became aware of the breach, it could have acted far faster and more aggressively in responding to the breach and in assisting victims in redressing harms, including taking *any* steps whatsoever to attempt to mitigate the harm caused by the breach.

57. Identity thieves use such PII to, among other things, gain access to bank accounts, social media accounts, and credit cards. Identity thieves can also use this PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government identification cards, or create "synthetic identities." Additionally, identity thieves often wait significant amounts of time—months or even years—to use the PII obtained in data breaches because victims often become less vigilant in monitoring their accounts as time passes, therefore making the PII easier to use without detection. These identity thieves will also re-use stolen PII and PHI, resulting in victims of one data breach suffering the effects of several cybercrimes from one instance of unauthorized access to their PII and PHI.

58. Victims of data breaches are much more likely to become victims of identity fraud than those who have not. Data Breach victims who do experience identity theft often spend

hundreds of hours fixing the damage caused by identity thieves.[30] Plaintiff and Class Members generally have spent considerable time and stress in attempting to mitigate the present and future harms caused by the breach. The U.S. Department of Justice's Bureau of Justice Statistics has reported that, even if data thieves have not caused financial harm, data breach victims "reported spending an average of about 7 hours clearing up the issues."[31]

59. The information compromised in the Data Breach—including detailed medical information—is much more valuable than the loss of credit card information in a retailer data breach. There, victims can simply close their credit and debit card accounts and potentially even rely on automatic fraud protection offered by their banks. Here, however, the information compromised is much more difficult, if not impossible, for consumers to re-secure after being stolen because it goes to the core of their identity. An individual's medical history and assessments are permanent and are impossible to escape. The loss of all this medical data puts Plaintiff and Class Members at additional risk for potential medical fraud and medical identity theft.

60. Data breaches and disclosures involving medical records are not only incredibly costly, they can "also [be] more difficult to detect, taking almost twice as long as normal identity theft."[32] The FTC warns that a thief may use private medical information to, among other things, "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance

---

[30] *Identity Theft: Protect Yourself, Secure Your Future*, MARYLAND OFFICE OF THE ATTORNEY GENERAL, https://www.marylandattorneygeneral.gov/ID%20Theft%20Documents/Identitytheft.pdf (last visited July 2, 2025).

[31] Erika Harrell, *Victims of Identity Theft, 2014*, U.S. DEP'T OF JUSTICE, https://bjs.ojp.gov/content/pub/pdf/vit14.pdf. (last visited July 2, 2025).

[32] *What to Know About Medical Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Nov. 22, 2023).

provider, or get other medical care"[33] and that this may have far reaching consequences for a victim's ability to access medical care and use insurance benefits.

## V. Defendant Failed to Comply with Industry Standards

61. Security standards for businesses storing PII and PHI commonly include, but are not limited to:

a) Maintaining a secure firewall

b) Monitoring for suspicious or unusual traffic on the website

c) Looking for trends in user activity including for unknown or suspicious users

d) Looking at server requests for PII

e) Looking for server requests from VPNs and Tor exit nodes

f) Requiring Multi-factor authentication before permitting new IP addresses to access user accounts and PII

g) Structuring a system including design and control to limit user access as necessary, including a user's access to the account data and PII of other users.

62. Other best practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

63. Defendant failed to meet minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR- DS-02, PR.DS-10,

---

[33] *Id.*

PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM- 06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIC CSC), which are all established standards in reasonable cybersecurity readiness.

64. These frameworks are existing and applicable healthcare industry standards which Defendant failed to comply with.

**VI. Defendant Failed to Comply with HIPAA Guidelines**

65. HIPAA requires covered entities such as Defendant to protect against reasonably foreseeable threats to the security of sensitive patient health information.

66. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

67. Title II of HIPAA contains the Administrative Simplification provisions, which require that the Department of Health and Human Services ("HHS") create rules to streamline standards for handling PII and PHI like the data that was not adequately safeguarded by Defendant.

68. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI is properly maintained.[34]

69. The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's safety failures include, but are not limited to:

a) Failing to ensure the confidentiality and integrity of electronic PHI that it creates,

---

[34] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b) Failing to protect against any reasonably anticipated threats or hazards to the security and integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c) Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d) Failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e) Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).

f) Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1).

g) Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

## VII. Plaintiff's and Class Members' Experiences

70. Plaintiff received a Data Breach notice dated March 27, 2026 via United States mail.

71. Plaintiff has obtained many forms of medical care from Defendant over the years, including emergency room services, diagnostic imaging services, and primary care services.

Plaintiff entrusted Defendant with his most sensitive Private Information in connection with these healthcare services.

72. Plaintiff provided Defendant with his most sensitive medical and personal information and cannot be sure how much of it was exfiltrated.

73. An unauthorized individual recently attempted to open a Wells Fargo bank account in Plaintiff's name. Plaintiff had to contact Wells Fargo to place a hold on this unauthorized account.

74. Plaintiff also purchased an annual subscription to Aura's identity protection services for $400 in the wake of the Data Breach.

75. Plaintiff suffered an actual injury in the form of damages and diminution in the value of his Private Information—a form of tangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

76. Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

77. Plaintiff has a continuing interest in ensuring that his Private Information, which upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

### VIII. Defendant Breached its Obligations to Plaintiff and the Class

78. Defendant fails to offer any compensation to victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private

Information, out-of-pocket costs, and the time taken by Plaintiff and Class Members to mitigate their injuries.

79. Plaintiff and Class Members have been damaged by the compromise and exfiltration by cyber-criminals of their Private Information as a result of the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of the Data Breach.

80. Plaintiff and Class Members were damaged since their Private Information is being sold or potentially for sale by cybercriminals in the years to come.

81. As a direct and proximate consequence of Defendant's conduct, Plaintiff and Class Members have been placed at an imminent, actual, and substantial risk of harm from fraud and identity theft, especially considering the actual fraudulent misuse of the Private Information that has already taken place.

82. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

83. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

84. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential

fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

85. Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cybercriminals in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

86. Cybercriminals sell health information at a far higher premium than stand-alone PII. This is because health information enables thieves to go beyond traditional identity theft and obtain medical treatments, purchase prescription drugs, submit false bills to insurance companies, or even undergo surgery under a false identity.[35] The shelf life for this information is also much longer—while individuals can update their credit card numbers, they are less likely to change their health insurance information. When medical identity theft occurs, the associated costs to victims can be exorbitant. According to a 2015 study, at least 65% of medical identity theft victims had to "pay an average of $13,500 to resolve the crime."[36]

87. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

---

[35] Medical Identity Theft: FAQs for Health Care Providers and Health Plans, FEDERAL TRADE COMMISSION, *available at* https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last visited Jan. 8, 2024).

[36] Justin Klawans, *What is medical identity theft and how can you avoid it?*, THE WEEK (Aug. 2, 2023), https://theweek.com/feature/briefing/1025328/medical-identity-theft-how-to-avoid (last visited July 23, 2025).

88. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a) Finding fraudulent charges;

b) Cancelling and reissuing credit and debit cards;

c) Purchasing credit monitoring and identity theft prevention;

d) Monitoring their medical records for fraudulent charges and data;

e) Addressing their inability to withdraw funds linked to compromised accounts;

f) Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g) Placing "freezes" and "alerts" with credit reporting agencies;

h) Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i) Contacting financial institutions and closing or modifying financial accounts;

j) Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k) Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l) Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

89. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial

information as well as health information is not accessible online and that access to such data is password protected.

90. Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII and PHI. Early notification helps a Data Breach victim mitigate their injuries, and conversely, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant knew of the breach since January 2026, and did not notify all victims until March 2026. Yet Defendant offered no explanation or purpose of the delay. This delay violates notification requirements and increased injuries to Plaintiff and the Class.

## CLASS ACTION ALLEGATIONS

91. Plaintiff brings this class action on behalf of himself and all other similarly situated individuals under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of the following Nationwide Class and Texas Subclass (together, the "Class"):

> **Nationwide Class:** All persons in the United States who were impacted by Defendant's Data Breach.
>
> **Texas Subclass:** All individuals in the state of Texas who were impacted by Defendant's Data Breach.

92. Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

93. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements therein.

94. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. Defendant has reported to the Maine Office of the Attorney General that 257,073 individuals were impacted by the Data Breach.

95. **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Class Members. These common questions, which do not vary among Class Members and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a) Whether Defendant failed to take adequate and reasonable measures to ensure its website and data systems were protected;

b) Whether Defendant failed to take available steps to prevent and stop the breach from happening or mitigating the risk of a long-term breach;

c) Whether Defendant unreasonably delayed in notifying affected individuals of the harm they suffered once the suspicious activity was detected;

d) Whether Defendant owed a legal duty to Plaintiff and Class Members to protect their PII and PHI;

e) Whether Defendant breached any duty to protect the personal information of Plaintiff and Class Members by failing to exercise due care in protecting their PII and PHI;

f) Whether Defendant took sufficient steps to secure Class Members' Private Information;

g) Whether Defendant was unjustly enriched;

h) Whether Plaintiff and Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and,

i) Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief or restitution.

96. **Typicality.** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way.

97. **Adequacy of Representation.** Plaintiff is an adequate class representative because he is a Class Member, and his interests do not conflict with the Class's interests. Plaintiff retained counsel who are competent and experienced in class action and data breach litigation. Plaintiff and his counsel intend to prosecute this action vigorously for the Class's benefit.

98. **Predominance and Superiority.** The Class can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Class Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Class Member's claim is impracticable. Even if each Class Member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

99. **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendant has acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

## CLAIMS FOR RELIEF

### Count 1
### Negligence
### On behalf of Plaintiff and the Nationwide Class

100. Plaintiff, individually and on behalf of the Nationwide Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

101. Plaintiff was required to provide PII and PHI as a precondition for receiving Defendant's healthcare services. Plaintiff and Nationwide Class Members entrusted their PII and PHI to Defendant with the understanding that it would safeguard their PII and PHI.

102. Defendant had full knowledge of the sensitivity of the PII and PHI that it stored and the types of harm that Plaintiff and Nationwide Class Members could and would suffer if that PII and PHI were wrongfully disclosed.

103. Defendant violated its duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing Defendant's information security controls sufficiently rigorously to ensure that PII and PHI in its possession was adequately secured by, for example, encrypting sensitive personal

information, installing effective intrusion detection systems and monitoring mechanisms, using access controls to limit access to sensitive data, regularly testing for security weaknesses and failures, failing to notify patients of the specific breached data in a timely manner, and failing to remedy the continuing harm by unreasonably delaying notifying specific victims who were harmed.

104. Defendant's duty of care arose from, among other things,

a) The special relationship between Defendant, Plaintiff, and Nationwide Class Members resulting from Plaintiff and Nationwide Class Members entrusting Defendant with confidential PII/PHI;

b) Defendant's exclusive ability (and Class Members' inability) to ensure that its systems, website, and vendor services were sufficient to protect against the foreseeable risk that a data breach could occur;

c) HIPAA, which requires Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

d) Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures; and

e) Defendant's common law duties to adopt reasonable data security measures to protect customer and employee PII and PHI and to act under the same or similar circumstances as a reasonable and prudent person would act.

105. Plaintiff and Nationwide Class Members were the foreseeable victims of Defendant's inadequate data security. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches. Defendant knew that a breach of its systems could and would cause harm to Plaintiff and Nationwide Class Members.

106. Defendant's conduct created a foreseeable risk of harm to Plaintiff and Nationwide Class Members. Defendant's conduct included its failure to adequately mitigate harm through negligently failing to inform victims of the breach.

107. Defendant knew or should have known of the inherent risks in collecting and storing massive amounts of PII and PHI and the importance of limiting disclosure of that PII and PHI.

108. Defendant, through its actions and inactions, breached its duty owed to Plaintiff and Nationwide Class Members by failing to exercise reasonable care in safeguarding their PII and PHI while it was in its possession and control. Defendant breached its duty by, among other things, its failure to adopt reasonable data security practices and its failure to adopt reasonable security and notification practices, failure to monitor the security of its networks and systems, and allowing unauthorized access to Plaintiff's and Nationwide Class Members' Private Information.

109. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Nationwide Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and Nationwide Class Members' injuries-in-fact.

110. Defendant inadequately safeguarded PII and PHI in breach of standard industry rules, regulations, and best practices at the time of the Data Breach.

111. But for Defendant's breach of its duty to adequately protect Nationwide Class Members' PII and PHI, Nationwide Class Members' PII and PHI would not have been stolen.

112. There is a temporal and close causal connection between Defendant's failure to implement adequate data security measures and notification practices, the Data Breach/unauthorized disclosure, and the harms suffered by Plaintiff and Nationwide Class Members.

113. As a result of Defendant's failure to timely notify Plaintiff and Nationwide Class Members that their Private Information had been compromised, Plaintiff and Nationwide Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

114. As a direct and traceable result of Defendant's negligence, Plaintiff and Nationwide Class Members suffered and will continue to suffer damages, including monetary damages, increased risk of future harm, loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach, overpayment for the services and products that were received without adequate data security; and embarrassment, humiliation, and emotional distress.

115. Plaintiff and Nationwide Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate identity protection services. Plaintiff and Nationwide Class Members are also entitled to the injunctive relief sought herein.

116. Plaintiff also seeks such other relief as the Court may deem just and proper.

**Count 2**
**Negligence *Per Se***
**On behalf of Plaintiff and the Nationwide Class**

117. Plaintiff, individually and on behalf of the Nationwide Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

118. Section 5 of the FTC Act, 15 U.S.C. § 45 prohibits, "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect Plaintiff's and Nationwide Class Members' Private Information.

119. Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff's and Nationwide Class Members' Private Information and by failing to comply with industry standards.

120. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems. Plaintiff was required to provide PII and PHI to Defendant. Plaintiff and Nationwide Class Members entrusted their PII and PHI to Defendant with the understanding that Defendant would safeguard their PII and PHI.

121. Nationwide Class Members are within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

122. Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Nationwide Class Members' Private Information.

123. Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA

Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304 (defining "encryption").

124. Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

125. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Nationwide Class Members would not have been injured.

126. The injury and harm suffered by Plaintiff and Nationwide Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it failed to meet its duties, and that Defendant's breach would cause Plaintiff and Nationwide Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

127. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Nationwide Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**Count 3**
**Breach of Implied Contract**
**On behalf of Plaintiff and the Nationwide Class**

128. Plaintiff, individually and on behalf of the Nationwide Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

129. Plaintiff and Nationwide Class Members entered into an implied contract with Defendant when they entrusted Defendant with their PII and PHI as a precondition for receiving healthcare services.

130. Pursuant to these contracts, Plaintiff provided Defendant with his Private Information. In exchange, Defendant agreed to: (1) use such Private Information for business purposes only, (2) retain Private Information only under conditions that kept such information secure and confidential, (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and Nationwide Class Members' Private Information; and (4) protect Plaintiff's and Nationwide Class Members' Private Information in compliance with federal and state laws and regulations, industry standards, and Defendant's representations regarding its security and privacy practices.

131. As part of these transactions, Defendant agreed to safeguard and protect the PII of Plaintiff and Nationwide Class Members and to timely and accurately notify them if their PII or PHI was breached or compromised.

132. Plaintiff and Nationwide Class Members entered into the implied contracts with the reasonable expectation that Defendant's data security practices and policies were reasonable and consistent with the legal requirements, industry standards, and Defendant's own representations. Plaintiff and Nationwide Class Members believed that Defendant would use part of the monies paid to Defendant under the implied contracts or the monies obtained from the benefits derived from the PII and PHI they provided to fund proper and reasonable data security practices.

133. Implicit in the agreement between Defendant, Plaintiff, and Nationwide Class Members was the obligation that both parties would maintain information confidentially and securely.

134. These exchanges constituted an agreement and meeting of the minds between the parties.

135. When the parties entered into an agreement, mutual assent occurred. Plaintiff and Nationwide Class Members would not have provided and entrusted their PII and PHI to Defendant in the absence of the implied contract or implied terms between them and Defendant. The safeguarding of the PII and PHI of Plaintiff and Nationwide Class Members was critical to realize the intent of the parties.

136. Plaintiff and Nationwide Class Members fully performed their obligations under the implied contracts with Defendant.

137. Defendant breached its implied contracts with Plaintiff and Nationwide Class Members to protect their PII and PHI when it (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) failed to comply with industry standards; (3) failed to comply with the legal obligations necessarily incorporated into these agreements; and (4) failed to notify Plaintiff and Nationwide Class Members of the Data Breach.

138. As a direct and proximate result of Defendant's breach of implied contract, Plaintiff and Nationwide Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII and PHI;

the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendant's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

139. As a direct and proximate result of the breach/unauthorized disclosure, Plaintiff and Nationwide Class Members are entitled to relief as set forth herein.

140. Plaintiff also seeks such other relief as the Court may deem just and proper.

**Count 4**
**Unjust Enrichment**
**On behalf of Plaintiff and the Nationwide Class**

141. Plaintiff, individually and on behalf of the Nationwide Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

142. This count is brought in the alternative to Plaintiff's breach of contract claim.

143. Plaintiff and Nationwide Class Members conferred a benefit on Defendant by providing Private Information to Defendant. Moreover, upon information and belief, Plaintiff and Nationwide Class Members allege that payments made by them to Defendant included payment for cybersecurity protection, and that those cybersecurity costs were passed on to Plaintiff and Nationwide Class Members in the form of elevated prices charged by Defendant for its services. Plaintiff and Nationwide Class Members did not receive such cybersecurity protection. Specifically, they provided Defendant with their PII and PHI. In exchange, Defendant should have provided adequate data security for Plaintiff and Nationwide Class Members.

144. Upon information and belief, Defendant funds its data security measures and website from its general revenue, including payments made by Plaintiff and Nationwide Class Members.

145. As such, a portion of the payments made for the benefit of or on behalf of Plaintiff and Nationwide Class Members is to be used to provide a reasonable level of data security including the protection of the data from inadvertent disclosure to third parties. Defendant's website and its security and privacy measures are entirely under the sole control of Defendant.

146. Defendant, however, failed to secure Plaintiff's and Nationwide Class Members' Private Information and, therefore, did not provide adequate data security in return for the benefit Plaintiff and Class Members provided.

147. Defendant would not be able to carry out an essential function of its regular business without the money and Private Information provided by its patients. Plaintiff and Nationwide Class Members expected that Defendant or anyone in Defendant's position would use a portion of that revenue to fund adequate data security practices.

148. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

149. Defendant knew that Plaintiff and Nationwide Class Members conferred a benefit upon it, which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Nationwide Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff's and Nationwide Class Members' Private Information and prevented the Data Breach.

150. If Plaintiff and Nationwide Class Members knew that Defendant had not reasonably secured their Private Information, they would not have provided their Private Information to Defendant.

151. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Nationwide Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the breach, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Nationwide Class Members by utilizing cheaper, ineffective security measures and cheaper contractors and diverting those funds to its own profit. Plaintiff and Nationwide Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

152. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained from Plaintiff and Nationwide Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

153. Plaintiff and Nationwide Class Members have no adequate remedy at law.

154. As a direct and proximate result of Defendant's conduct, Plaintiff and Nationwide Class Members have suffered or will suffer injuries that include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft

insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII and PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendant's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

155. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Nationwide Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members were underpaid by Defendant.

156. Plaintiff also seeks such other relief as the Court may deem just and proper.

**Count 5**
**Injunctive/Declaratory Relief**
**On behalf of Plaintiff and the Nationwide Class**

157. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

158. Defendant owes a duty of care to Plaintiff and Nationwide Class Members, which required Defendant to adequately monitor and safeguard Plaintiff's and Nationwide Class Members' PII and PHI.

159. Defendant and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII and PHI belonging to Plaintiff and Nationwide Class Members.

160. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Nationwide Class Members' PII and PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Nationwide Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and the Nationwide Class continue to suffer injury as a result of the compromise of their PII and PHI and the risk remains that further compromises of their Private Information will occur in the future.

161. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a) Defendant owes a legal duty to adequately secure the PII and PHI of Plaintiff and the Nationwide Class within its care, custody, and control under the common law, HIPAA, and Section 5 of FTC Act;

b) Defendant breached its duty to Plaintiff and the Nationwide Class by allowing the Data Breach to occur;

c) Defendant's existing data monitoring measures do not comply with its obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the PII and PHI of Plaintiff and the Nationwide Class within Defendant's custody, care, and control; and

d) Defendant's ongoing breaches of said duties continue to cause harm to Plaintiff and the Nationwide Class.

162. This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with healthcare industry standards to protect the PII and PHI of Plaintiff and the Nationwide Class within its custody, care, and control, including the following:

a) Order Defendant to provide lifetime credit monitoring and identity theft insurance and protection services to Plaintiff and Nationwide Class Members; and

b) Order that, to comply with Defendant's obligations and duties of care, Defendant must implement and maintain reasonable security and monitoring measures, including, but not limited to:

i. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems, networks, and servers on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

ii. Encrypting and anonymizing the existing PII and PHI within its servers, networks, and systems to the extent practicable, and purging all such information which is no longer reasonably necessary for Defendant to provide adequate medical services to its patients;

iii. Engaging third-party security auditors and internal personnel to run automated security monitoring;

iv. Auditing, testing, and training its security personnel regarding any new or modified procedures;

v. Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems, networks, and servers;

vi. Conducting regular database scanning and security checks; and

vii. Routinely and continually conducting internal training and education to inform Defendant's internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

163. If an injunction is not issued, Plaintiff and the Nationwide Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiff and the Nationwide Class will not have an adequate remedy at law because monetary relief alone will not compensate Plaintiff and the Nationwide Class for the serious risks of future harm.

164. The hardship to Plaintiff and the Nationwide Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Plaintiff and the Nationwide Class will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendant's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

165. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach or

cybersecurity incident, thus preventing future injury to Plaintiff and the Nationwide Class and other persons whose PII and PHI would be further compromised.

**Count 6**
**Violation of the Texas Deceptive Trade Practices Act**
**Texas Bus. & Com. Code § 17.41 *et seq.***
**On behalf of Plaintiff and the Texas Subclass**

166. Plaintiff reincorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein on behalf of the Texas Subclass.

167. Defendant is a "person" as defined by Tex. Bus. & Com. Code § 17.45(3).

168. Plaintiff and the Texas Subclass Members are "consumers," as defined by Tex. Bus. & Com. Code § 17.45(4).

169. Defendant advertised, offered, or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

170. Defendant engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including:

a) Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b) Representing that goods or services are of a particular standard, quality or grade, if they are of another;

c) Advertising goods or services with intent not to sell them as advertised; and

d) Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

171. Defendant's false, misleading, and deceptive acts and practices include:

a) Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Texas Subclass Members' PHI and PII, which was a direct and proximate cause of the Data Breach;

b) Failing to identify and remediate foreseeable security and privacy risks and sufficiently improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c) Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Texas Subclass Members' PHI and PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052, which was a direct and proximate cause of the Data Breach;

d) Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Texas Subclass Members' PHI and PII, including by implementing and maintaining reasonable security measures;

e) Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Texas Subclass Members' PHI and PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052;

f) Omitting, suppressing, and concealing the material fact that it did not properly secure Plaintiff's and Texas Subclass Members' PHI and PII; and

g) Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of

Plaintiff's and Texas Subclass Members' PHI and PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052.

172. Defendant intended to mislead Plaintiff and Texas Subclass Members and induce them to rely on its misrepresentations and omissions.

173. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of patients' PII and PHI.

174. Had Defendant disclosed to Plaintiff and the Texas Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business, and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant was entrusted with sensitive and valuable PII and PHI concerning hundreds of thousands of patients, including Plaintiff and Texas Subclass Members. Defendant accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Texas Subclass Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

175. Defendant had a duty to disclose the above facts due to the circumstances of this case, the sensitivity and extent of the PII and PHI in its possession, and the generally accepted professional standards. Such a duty is implied by law due to the nature of the relationship between consumers, including Plaintiff and Texas Subclass Members, and Defendant, because consumers

are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendant. Defendant's duty to disclose also arose from its:

a) Possession of exclusive knowledge regarding the security of the data in its systems;
b) Active concealment of the state of its security; and/or
c) Incomplete representations about the security and integrity of its computer and data systems, while purposefully withholding material facts from Plaintiff and Texas Subclass Members that contradicted these representations.

176. Defendant engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Defendant engaged in acts or practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

177. Consumers, including Plaintiff and Texas Subclass Members, lacked knowledge about deficiencies in Defendant's data security because this information was known exclusively by Defendant. Consumers also lacked the ability, experience, or capacity to secure the PII and PHI in Defendant's possession or to fully protect their interests with regard to their data. Plaintiff and Texas Subclass Members lack expertise in information security matters and do not have access to Defendant's systems in order to evaluate its security controls. Defendant took advantage of its special skill and access to PII and PHI to hide its inability to protect the security and confidentiality of Plaintiff's and Texas Subclass Members' PII and PHI.

178. Defendant intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result. The unfairness resulting from Defendant's conduct is glaring, flagrant, complete, and unmitigated. The Data Breach, which resulted from Defendant's unconscionable business acts

and practices, exposed Plaintiff and Texas Subclass Members to a wholly unwarranted risk to the safety of their PII and PHI and the security of their identity or credit, and worked a substantial hardship on a significant number of consumers. Plaintiff and Texas Subclass Members cannot mitigate this unfairness because they cannot undo the Data Breach.

179. Defendant acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff's and Texas Subclass Members' rights.

180. As a direct and proximate result of Defendant's unconscionable and deceptive acts or practices, Plaintiff and Texas Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial and medical accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII and PHI; overpayment for Defendant's services; loss of the value of access to their PII/PHI; and the value of identity protection services made necessary by the Data Breach. Defendant's unconscionable and deceptive acts or practices were a producing cause of Plaintiff's and Texas Subclass Members' injuries, ascertainable losses, economic damages, and non-economic damages, including their mental anguish.

181. Defendant's violations present a continuing risk to Plaintiff and Texas Subclass Members as well as to the general public. Contemporaneous with the filing of this complaint, pursuant to Tex. Bus. & Com. Code Ann. § 17.505, Plaintiff's counsel will send written notice to Defendant.

182. Plaintiff and Texas Subclass Members seek all monetary and non-monetary relief allowed by law, including economic damages; damages for mental anguish; treble damages for

each act committed intentionally or knowingly; court costs; reasonably and necessary attorneys' fees; injunctive relief; and any other relief which the court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class set forth herein, respectfully requests the following relief:

A. That the Court certify this action as a class action and appoint Plaintiff and his counsel to represent the Class;

B. That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendant to adequately safeguard the PII and PHI of Plaintiff and the Class by implementing improved security controls;

C. That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D. That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of Defendant's unlawful acts, omissions, and practices;

F. That the Court award to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G. That the Court award pre- and post-judgment interest at the maximum legal rate; and

H. All such other relief as it deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: April 10, 2026

Respectfully submitted,

*/s/ Leanna A. Loginov*
Leanna A. Loginov, Esq.
SHAMIS & GENTILE, P.A.
14 NE 1st Ave, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
lloginov@shamisgentile.com

Amber L. Schubert*
SCHUBERT JONCKHEER & KOLBE LLP
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: 415-788-4220
Fax: 415-788-0161
aschubert@sjk.law

Counsel for Plaintiff and the Proposed Class

*pro hac vice forthcoming